UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Irina Assur,

        Plaintiff,

        v.                                              Civil Action No. 2:06-CV-239

Central Vermont Medical Center,
Roseanne Palmer, Helen Spring,
Rick Theken, Daria Mason,

        Defendants.

## REPORT AND RECOMMENDATION
### (Doc. 117)

      Plaintiff Irina Assur, formerly a nurse at Central Vermont Medical Center

("CVMC"), filed the instant action *pro se* on December 4, 2006 alleging that Defendants

committed a variety of torts against her (chiefly defamation) and violated her

constitutional rights. (Doc. 1.)  These claims arose out of her employment at CVMC and

subsequent disciplinary proceedings brought against her by Vermont's Office of

Professional Regulation ("OPR").  Because her allegations relate to both her employment

at CVMC and the state disciplinary proceedings arising therefrom, Plaintiff originally

filed suit against CVMC and individuals affiliated with CVMC, including Roseanne

Palmer, Helen Spring, Rick Theken, and Daria Mason (collectively "hospital

defendants"), as well as state officials involved in the OPR proceeding, including Edward

Adrian, Jessica Porter, and Christopher Winters (collectively "state defendants").

The state defendants moved to dismiss on the basis of judicial immunity, prosecutorial immunity, and official capacity immunity. (Doc. 20.) A Report and Recommendation concluded that the motion be granted, and that all claims against the state defendants in their individual and official capacities be dismissed. (Doc. 41.) The district court adopted that recommendation. (Doc. 49.) Similarly, the hospital defendants moved for judgment on the pleadings, primarily arguing that most of Plaintiff's claims fall outside the applicable three-year statute of limitations. (Doc. 13.) A Report and Recommendation concluded that motion should be denied, largely due to the uncertainty in the record and the deference owed to allegations in a plaintiff's complaint at the initial stage in the proceedings. (Doc. 41.) The district court again adopted the recommendation. (Doc. 49.) Plaintiff later filed an Amended Complaint. (Doc. 102.)

Now, the hospital defendants (hereafter just "Defendants") have filed the instant Motion for Summary Judgment, raising mainly the same legal arguments as in their motion for judgment on the pleadings, buttressed by firmer evidentiary support. (Doc. 117.) Specifically, Defendants maintain that: (1) Plaintiff's claims are barred by the three-year statute of limitations and proper application of Vermont's "discovery rule" governing claim accrual; and (2) this action is barred by the statutory immunity provided by 26 V.S.A. § 1582(d) regarding information reported in good faith to the Vermont State Board of Nursing. (*Id.*) Plaintiff opposes the Motion. (Doc. 123.) A hearing on the Motion was held on November 19, 2012.

For the reasons that follow, I recommend that Defendants' Motion for Summary Judgment be GRANTED because Plaintiff's claims are barred by the statute of limitations and by statutory immunity, 26 V.S.A. § 1582(d).

## Factual and Procedural Background

Plaintiff was employed as a registered nurse at CVMC from September 3, 1998 until June 6, 2002. (Doc. 117-1 at 1; Doc. 102 at 2.) Plaintiff alleges that, during her first two years at the hospital, on two separate occasions, "charge nurses" requested that she administer medication without a doctor's order, in violation of nursing practices. (Doc. 102 at 2; Doc. 24 at 15; Doc. 123-27 at 1.) When she refused, these nurses complained to Roseanne Palmer, the former Director of Inpatient Services at CVMC. (Doc. 102 at 2.) Palmer told Plaintiff "that she should do what she was told to do." (*Id*. at 3.)

In January 2000, Plaintiff was diagnosed with life-threatening cancer. (Doc. 102 at 3.) After learning that "EMF radiation" could have possibly been the cause of her cancer, Plaintiff "took readings of EMF radiation emitted by some computers at CV[MC]." (*Id*.) After raising her concerns about the radiation with Palmer, Plaintiff attended a meeting with a hospital administrator. (*Id*.) During this meeting, Plaintiff was informed that the facility had hired an expert who had evaluated the x-ray emissions from computer monitors. (*Id*.) Plaintiff responded that she was concerned about EMF radiation, not x-ray radiation.[1] (*Id*.) Thereafter, Plaintiff decided to supplement her

---

[1] The record is unclear as to whether the hospital ever responded to Plaintiff's concerns beyond holding this meeting.

cancer treatment with vitamins and other complementary therapy. (*Id*.) Palmer, having learned of Plaintiff's decision, then asked her to attend a meeting with both Palmer and Helen Spring, the VP of Nursing at CVMC. (*Id*.) At this meeting, Spring asked Plaintiff "intrusive probing questions into Plaintiff's private, personal decision to seek complementary treatment for her cancer." (*Id*.)

Beginning in 1999 and extending into 2002, Palmer approached Plaintiff with "numerous vague, wrongful, or specious allegations" of her alleged misconduct. (Doc. 102 at 4.) Plaintiff discussed each allegation with Palmer, provided her with "correct facts," and "Plaintiff was led to believe the matters were settled." (*Id*.) Nonetheless, on December 5, 2001, Palmer gave Plaintiff a written warning. (*Id*.; Doc. 117-1 at 2; Doc. 117-17 at 1.) Plaintiff claims that this warning was contrary to CVMC policy, which "required that a documented verbal warning precede a written warning." (Doc. 102 at 4.) In any event, Plaintiff immediately obtained Palmer's notes relating to the allegations, which Palmer had prepared as support for the written warning. (*Id*.; Doc. 117-1 at 2.) According to Plaintiff's Amended Complaint, "[t]he notes disclosed that for about three years, Palmer had been creating defamatory notes regarding Plaintiff . . . and the notes also revealed that Palmer had spoken in a defamatory way with others, enlisting Spring and others into a tacit agreement to conspire with unlawful retaliation against Plaintiff." (*Id*.) Plaintiff's Amended Complaint also states that Palmer failed to incorporate Plaintiff's facts into her investigation, and instead created "false facts originating from Palmer and not . . . from evidence." (*Id*. at 5.) Plaintiff alleges that she "felt and

continues to feel deep emotional distress, mental anguish and trauma over what she discovered in the notes." (*Id.*)

In a mid-December 2001 meeting in the presence of Rick Theken, then-VP of Human Resources at CVMC, Plaintiff confronted Palmer about the alleged fabrications in her notes. (Doc. 102 at 5.) Palmer did not respond, but instead told Plaintiff that she did not need to investigate the allegations "because she already knew the truth." (*Id.* at 5-6.) After this meeting, Palmer told Plaintiff that she would be terminated if Palmer received any more complaints about her from anyone. (*Id.* at 6.) On or about January 2, 2002, Plaintiff approached Theken with a letter detailing her allegations of Palmer's misconduct, but Theken "responded that he did not believe that one of CV[MC]'s managers was doing this." (*Id.*)

The allegations in Palmer's notes were also the subject of a January 3, 2002 meeting to address a "Corrective Action Plan" with Plaintiff, Theken, and Palmer. (Doc. 117-10.) "The general theme of the complaints [discussed at this meeting was the] lack of accurate, timely assessment and follow[-]through leading to substandard nursing care." (Doc. 117-2.) According to a memorandum written by Plaintiff and dated January 4, 2002, this meeting, which was "supposed to be a mediation session to resolve a dispute," devolved into a "disciplinary action" with "no objectivity in the process." (Doc. 117-11 at 1.) The memorandum describes the meeting as "mostly accusatory" and fraught with "emotional manipulation" by the use of "slander[] [and] defamation," with the "goal of punishment and intent to cause pain." (*Id.* at 1-2.)

On January 17, 2002, Plaintiff filed a formal grievance within the hospital. (Doc. 102 at 6; Doc. 117-17 at 1; Doc. 117-13.) In her grievance, Plaintiff sought to have the corrective action "dropped and removed from [her] file" because Palmer "holds onto a bias" which had resulted in "[a] few cases of slander and libel." (Doc. 117-13 at 2.) While this grievance was pending, another internal complaint was filed against Plaintiff at CVMC.[2] (Doc. 117-17 at 1.) This complaint, as well as the earlier complaint that had led to her grievance, resulted in the implementation of an improvement plan, which required Plaintiff to (a) switch to working the day shift under the supervision of another nurse for four weeks (Doc. 117-2), and (b) adhere to enumerated developmental guidelines (Doc. 117-3). A memorandum dated February 8, 2002 outlined the goals of this plan.[3] (Doc. 117-3.) On March 18, 2002, after the implementation of the plan,

---

[2] Plaintiff alleged in her Amended Complaint that, in preparation for the grievance, she presented Bob O'Donnell, CVMC's former Human Resources Manager, with a written list of questions for Palmer to answer. (Doc. 117-12.) According to Plaintiff, Palmer never provided the answers, and subsequently withdrew all but one allegation from the internal complaint. (Doc. 102 at 7.)

[3] The listed "workplan goals" were as follows:
"Demonstrates knowledge of policies and procedures. Implements Nursing care in accordance with Nursing and CVMC policies and philosophy.
Complete daily assessments and documentation of patient care information.
Provides individualized nursing care, including physical and psychosocial needs of patient.
Evaluates effectiveness of Nursing care, recognizes changes in patient condition and provides appropriate response.
Collaborates with patient, significant other and members of the health team to achieve optimal patient outcomes. Consistently demonstrates concern for patient and family outcome.
Maintains patient's dignity and confidentiality.
Communicates with patients and family in a manor [sic] that is consistent with CVMC mission and philosophy.
Review of VT Nurse Practice Act and the Nurse Code of Ethics. Conforms to the essential standards of prevailing and acceptable Nursing practice.
Consistently communicates with CNC/relief charge on issues related to patient care.
Demonstrates appropriate management of work time (i.e. minimal personal phone calls, minimal non-work related conversations during unit's high activity times).
Consistently responds to patient call lights and patient care needs.
Absence of verbal and/or written complaints generated by patients, families or staff.
Demonstrates ability to receive constructive guidance in a professional manor [sic]."

6

Plaintiff was still found to be deficient in a number of respects (Doc. 117-4), such that she was required to complete a twelve-week nursing refresher course at CVMC's expense (Doc. 117-17 at 2). Spring notified Plaintiff that she would have to take the course before she could continue to work at CVMC. (*Id.*) Plaintiff was advised that if she declined to take the course, she would be terminated from her employment. (Doc. 117-5 at 3; Doc. 123-48.)

On March 28, 2002, Palmer and Spring filed a "Report of Unprofessional Conduct" with the Board of Nursing, which was based on the same conduct giving rise to the CVMC disciplinary action, namely concerns about Plaintiff's "ability to perform the basic standards of nursing care, at an acceptable level." (Doc. 117-5 at 3; *see also* Doc. 117-17 at 2; Doc. 117-5 at 1; Doc. 102 at 7; Doc. 123-49.) The Report detailed the attempts made to resolve the conflict and the recommendation that Plaintiff participate in a refresher course, and stated that Plaintiff had filed a grievance based on the CVMC's corrective action. (Doc. 117-5.) In light of the internal allegations of misconduct against Plaintiff, Palmer and Spring were required by law to file this Report, *see* 3 V.S.A. § 128(a); according to Spring's affidavit, they did not file it out of a "desire to see the Board take any particular action against [Plaintiff]." (Doc. 117-17 at 3.)

The hearing regarding Plaintiff's grievance was held on April 16, 2002 before a peer panel composed of two nurses and one department head. (Doc. 102 at 7; Doc. 117-1 at 4; Doc. 123-44.) Palmer limited the disciplinary action to a single instance of patient mistreatment. (Doc. 117-1 at 4.) In advance of the hearing, Plaintiff submitted a lengthy statement responding to the charges. (Doc. 117-9.) The grievance panel ultimately found

in Plaintiff's favor and invalidated the disciplinary action. (Doc. 102 at 8; Doc. 117-17 at 1; Doc. 117-1 at 4; Doc. 123-50; Doc. 123-52.) Nonetheless, after receiving other employment, Plaintiff resigned from CVMC on June 6, 2002. (Doc. 117-17 at 3; Doc. 102 at 8.)

The case did not end there. Because the matter had been referred to the Board of Nursing, OPR began an investigation, which involved interviews with Palmer, Plaintiff, and several nurses who had worked with Plaintiff during the relevant period. (Doc. 117-6.) The OPR's Investigative Report included the following allegations, based on statements made by the interviewees:

(1) Patient C.H.,[4] a 93 year-old terminal patient, was found with a pooling of secretions and in discomfort while under Plaintiff's care. C.H. was in a great deal of pain, had labored breathing, and had her appendages hanging over the bed railing. When another nurse approached Plaintiff about C.H.'s condition, Plaintiff responded that C.H. was a "no code" and was "comfort care only." (Doc. 117-7 at 3; Doc. 117-6 at 28-30.)

(2) Plaintiff told patient C.A., who complained of chest pain, that her pain was a result of the "weight" of her brother who had sexually abused her as a child. (Doc. 117-7 at 2; Doc. 117-6 at 30-31.)

(3) Plaintiff told elderly patient E.D, who had told Plaintiff that she had seen angels, that people who are dying see angels. Neither E.D. nor her family had been anticipating E.D.'s death at the time. (Doc. 117-7 at 2; Doc. 117-6 at 32.)

---

[4] Patient names have been redacted and replaced with initials in all records of these proceedings.

(4) Patient M.H. was left untreated by Plaintiff during six bouts of diarrhea because Plaintiff was on the telephone or in conversation with others.  (Doc. 117-7 at 2; Doc. 117-6 at 33.)

(5) Three patients under Plaintiff's care were found in poor hygienic condition, including having feces on their person and in their beds.  (Doc. 117-7 at 2; Doc. 117-6 at 32.)

(6) Plaintiff indicated to another nurse that she did not want to ask patients about their symptoms because she was afraid she would develop those symptoms herself.  (Doc. 117-7 at 2; Doc. 117-6 at 32.)

(7) Plaintiff failed to give certain patients their medications in a timely fashion.  (Doc. 117-7 at 2-3; Doc. 17-6 at 33.)

(8) Plaintiff used outdated intravenous fluid bags.  (Doc. 117-7 at 3; Doc. 117-6 at 34.)

These were the primary allegations discussed with Plaintiff during an interview conducted by an OPR investigator in November 2002.  (Doc. 117-6 at 28.)  During this interview, Plaintiff provided the investigator with the "correct facts relating to the allegations in order to assist the investigative committee in making a proper determination."  (Doc. 102 at 9.)

On December 2, 2003, over a year after Plaintiff's interview with the OPR investigator, OPR filed a Specification of Charges against Plaintiff.  (Doc. 117-7.)  The charges identified approximately 17 incidents of "unsafe or unacceptable patient care" (*id.* at 1) as grounds for discipline.  (*Id.* at 2-3.)  According to her Amended Complaint,

Plaintiff received notice of the publication of these charges on December 9, 2003, and received her own copy of the Investigative Report on December 19, 2003. (Doc. 102 at 8-9.) Plaintiff alleged that "[t]he defamatory allegations [contained in the Report] included new versions of the same allegations Palmer had withdrawn prior to the grievance hearing." (*Id*. at 9.)[5]

Proceeding *pro se*, Plaintiff filed her original Complaint on December 4, 2006. (Doc. 1.) Since then, Plaintiff has filed an Amended Complaint which brings six separate causes of action against Defendants: (1) defamation; (2) retaliation in violation of Vermont's Whistleblower Act, 21 V.S.A. § 507; (3) retaliation in violation of the First Amendment; (4) denial of equal protection; (5) deprivation of civil rights and due process; and (6) intentional infliction of emotional distress. (Doc. 102.) Plaintiff seeks an injunction on any further defamatory publications, as well as compensatory and punitive damages. *(Id*. at 18-20.)

After the claims against the state defendants were dismissed on grounds of immunity (Doc. 41; Doc. 49), Defendants moved for summary judgment (Doc. 117).

## Discussion

### I.     Summary Judgment Standard

The principles governing the role of this Court on a motion for summary judgment are well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[5]  The State dismissed the OPR Specification of Charges without prejudice on November 24, 2010, on the basis that Plaintiff had "consistently met the standards of [her] employer" over the seven years while the charges were pending. (Doc. 117-8.)

as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Factual assertions must be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  The moving party bears the burden to show that no genuine issue of material fact exists.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

To defeat a motion for summary judgment, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, "there must be evidence on which the jury could reasonably find for the" opposing party. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In deciding whether the non-movant has made this showing, the court must construe the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor.  *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50).  The court cannot "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact."  *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995); *see City of Burlington v. Hartford Steam Boiler Inspection and Ins. Co.*, 190 F. Supp. 2d 663, 669 (D. Vt. 2002).  In essence, the court must determine whether the case raises issues that merit trial; the central question is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

Specifically, in this case Defendants seek summary judgment asserting the affirmative defenses of the statute of limitations and statutory immunity. In such circumstances, summary judgment is appropriate when there is no issue of material fact as to an affirmative defense. *See USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 185 (S.D.N.Y. 2011) (citing *Hosel & Anderson, Inc. v. ZV II, Inc.*, NO. 00 Civ. 6957, 2001 WL 392229, at *1 (S.D.N.Y. Mar. 21, 2001).

Furthermore, with respect to a motion for summary judgment involving a non-moving, *pro se* plaintiff, the court "liberally construe[s] [the] pleadings and briefs submitted by [the] *pro se* litigant[]," "reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (quotation marks omitted). But "[e]ven a *pro se* plaintiff [] cannot withstand a motion for summary judgment by relying merely on the allegations of a complaint." *Saldana v. Local 32B-32J Serv. Emps. Int'l Union*, No. 03 Civ. 1853, 2005 WL 66895, at *4 (S.D.N.Y. Jan. 12, 2005).[6]

---

[6] The Second Circuit has required that *pro se* litigants be provided with explicit notice of the consequences of failing to respond to a motion for summary judgment. *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999); *see also* Local Rule 56(e). The required notice was sent in this case. (Doc. 118.)

## II.    Statute of Limitations

The Defendants assert that Plaintiff's claims are barred by the statute of limitations.  The limitations period applicable to all of Plaintiff's state[7] and federal[8] claims is three years.  During the hearing on the instant motion, Plaintiff agreed that a three-year limitations period applies to all of her claims.  Because Plaintiff filed her Complaint on December 4, 2006, any claims that accrued before December 4, 2003 are barred.

Under Vermont law, claim accrual is governed by the "discovery rule."  Under this rule, a claim accrues (and thus the statute of limitations begins to run) upon the "'discovery of facts constituting the basis of the cause of action *or* the existence of facts

---

[7] This Court must apply state statutes of limitations to claims based on state law, and federal statutes of limitations, where available, to those based on federal law.  Plaintiff's defamation claim is governed by the three-year limitations period set forth in 12 V.S.A. § 512(3).  Her intentional infliction of emotional distress claim is governed by the same period pursuant to 12 V.S.A. § 512(4).  *See Rennie v. State*, 171 Vt. 584, 586-87 (2000).  Vermont's whistleblower protection statute, 21 V.S.A. § 507, has no express limitations period.  Defendants correctly argue, however, that the "nature of the harm done is the determining factor in construing the [statute's] two limitations provisions [(§§ 511 and 512)] rather than the [party's] characterization of the action."  *Fitzgerald v. Congleton*, 155 Vt. 283, 288-89 (1990) (quoting *Stevers v. E.T. & H.K. Ide Co., Inc.*, 148 Vt. 12, 13 (1987)).  Because the alleged harm arising from Plaintiff's claim under the whistleblower protection statute consists solely of emotional distress, the three-year limitations period applicable to personal injury claims also applies to this claim.  *See Fitzgerald*, 155 Vt. at 293 ("damages resulting from emotional distress is an 'injury to the person' and must be commenced within three years after the cause of action accrues").  Plaintiff has not disputed Defendants' application of the three-year limitations period to her whistleblower protection claim.

[8] While there are enumerated statutes of limitations for the state law claims brought by Plaintiff, there are none for Plaintiff's federal claims, including her First Amendment, Due Process, and Equal Protection claims brought under 42 U.S.C. §§ 1983 and 1985.  Therefore, the Court must borrow the "most appropriate," *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462 (1975), or "most analogous," *Bd. of Regents v. Tomanio*, 446 U.S. 478, 488 (1980), state statute of limitations, as long as that result is not inconsistent with federal policy, *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34-35 (1995).  In *Wilson v. Garcia*, 471 U.S. 261, 280 (1985), the Supreme Court held that, for statute of limitations purposes, "§ 1983 claims are best characterized as personal injury actions."  *See Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 662 (1987); *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004); *Okure v. Owens*, 816 F.2d 45 (2d Cir. 1987), *aff'd*, 488 U.S. 235 (1989).  Thus, I conclude that Vermont's generally-applicable three-year statute of limitations for personal injury claims applies to Plaintiff's federal claims.  *See* 12 V.S.A. § 512; *Morse v. University of Vermont*, 776 F. Supp. 844 (D. Vt. 1991).

sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery.'" *Union Sch. Dist. v. Lench*, 134 Vt. 424, 427 (1976) (quoting *Omaha Paper Stock Co. v. Martin K. Eby Constr. Co.*, 230 N.W.2d 87, 89-90 (Neb. 1975)) (emphasis added). In assessing whether a plaintiff is on inquiry notice, the plaintiff is "chargeable with notice of all the facts that could have been obtained by the exercise of reasonable diligence in prosecuting [the] inquiry." *Lamoille Cnty. Sav. Bank & Trust Co. v. Belden*, 90 Vt. 535, 541 (1916). The Vermont Supreme Court has specifically applied the discovery rule to defamation claims, *see Dulude v. Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 85 (2002), and this same rule applies to federal claims under 42 U.S.C. § 1983, *see M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221 (2d Cir. 2003) ("a cause of action generally accrues 'when the plaintiff knows or has reason to know of the injury that is the basis of the action'" (quoting *Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993))).

Applying the discovery rule, Plaintiff's claims are untimely if, prior to December 4, 2003, she had discovered facts constituting the basis of these claims, or if facts existed prior to that date which were sufficient to put a person of ordinary intelligence on inquiry notice and which, if pursued, would lead to the discovery of facts constituting the basis of these claims. For the reasons explained in greater detail below, every claim is barred by the statute of limitations, as well as various deficiencies specific to each cause of action. Each of Plaintiff's claims is addressed seriatim.

## A.    Defamation

Under Vermont law, the elements of defamation are:

(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.

*Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 291 (1990).  Vermont courts defer the accrual of a defamation cause of action "until the plaintiff discovers or, through the exercise of reasonable care and diligence, should have discovered the nature of the defamatory communication."  *Dulude*, 174 Vt. at 85.  Application of the discovery rule is particularly important where "publication is likely to be concealed from the plaintiff or published in a secretive manner."  *Id*.  Accordingly, assessment of the proper accrual of this cause of action requires a detailed assessment of what Plaintiff knew and when she knew it.

Prior to any communications to OPR, Plaintiff was well aware of the allegations that had been made regarding her professional conduct.  As early as December 5, 2001, Plaintiff had in her possession Palmer's "defamatory notes regarding Plaintiff . . . and the notes also revealed that Palmer had spoken in a defamatory way with others, enlisting Spring into a tacit agreement to conspire with unlawful retaliation against Plaintiff."  (Doc. 102 at 4.)  But in her deposition, Plaintiff explicitly disclaimed any defamation claim relating to publication of defamatory information between employees at CVMC.[9]

---

[9] This position is in marked contrast with Plaintiff's argument in her response to Defendants' motion for judgment on the pleadings, in which Plaintiff asked this Court to equitably toll the running of the limitations period during the pendency of the OPR proceeding.  Plaintiff makes no argument for

(Doc. 117-18 at 5.) Instead, she stated that her claim arises from information "communicated outside of CV[MC]," specifically, to OPR. (*Id*.) These representations confine the scope of Plaintiff's claim. *See AEP Energy Servs Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699, 736 (2d Cir. 2010). As a result, for the purposes of her defamation claim, the only relevant communications are those between Defendants and individuals at OPR.

Plaintiff became aware of the existence of a complaint to the Board of Nursing on March 28, 2002. (Doc. 102 at 7.) Approximately seven months later, Plaintiff discussed almost all of the allegations raised in that complaint with an OPR investigator. (Doc. 117-6 at 28.) By Plaintiff's own description, this conversation allowed her to provide "correct facts relating to the allegations in order to assist the investigative committee in making a proper determination." (Doc. 102 at 9.) Plaintiff further acknowledges in her Amended Complaint that the allegations discussed "included new versions of the same allegations Palmer had withdrawn prior to the grievance hearing," allegations of which Plaintiff was already well aware. (*Id*.)

Indeed, a detailed comparison of this conversation and the subsequently-filed Specification of Charges reveals that Plaintiff was apprised of nearly every issue OPR was investigating. Based on both a contemporaneous response written by Plaintiff (Doc. 123-10) as well as Plaintiff's affidavits submitted before this Court (Doc. 123-9; Doc. 123-75), Plaintiff was aware of almost every allegation against her after the November

_____

equitable tolling at this stage because, in her words, "[t]he statute of limitations had expired" on claims of "defamation employee to employee within CV[MC]." (Doc. 117-18 at 6.)

2002 conversation with the investigator.  This is also borne out by the investigator's

report, which provides a detailed description of the conversation with Plaintiff.  (Doc.

117-6 at 28-37.)  As a result, Plaintiff had actual notice that the allegedly defamatory

statements had been published to OPR, and inquiry notice regarding all allegations not

discussed in the November 7, 2002 OPR interview.  Under the applicable statute of

limitations, Plaintiff had until November 7, 2005 to file her defamation claim against

Defendants.[10]

Much of Plaintiff's argument to the contrary rests on an assumption that she must

have been apprised of every detail of the publication from Defendants to OPR for her

cause of action to accrue under the applicable discovery rule.  This is not the law.  In

general, "discovery means discovery of facts constituting *the basis of the cause of*

*action*."  *Union Sch. Dist.*, 134 Vt. at 427 (emphasis added); *see Lillicrap v. Martin*, 156

Vt. 165, 174 (1989) (cause of action accrues when reasonable person should be able to

---

[10]  This Court declined to grant Defendants' motion for judgment on the pleadings because
Plaintiff represented that the OPR "specification of charges," which she did not receive until December,
19, 2003 (i.e., within the statute of limitations), had included "new and additional publication of
defamation."  (Doc. 24 at 2.)  Having compared the contemporaneous materials reflecting the content of
the Plaintiff's November 2002 conversation (i.e., investigator's notes and Plaintiff's submission to the
investigator) against the December 2003 specification of charges, this assertion is plainly contradicted by
the record.
    Plaintiff now argues, in her response to the motion for summary judgment, that the OPR
investigator "refused to provide information regarding what was provided by CV[MC]" to OPR.  (Doc.
123 at 7.)  Plaintiff also makes this argument by affidavit.  (Doc. 123-9 at 2; 123-75.)  This position is
contradicted by her Complaint and the evidence, specifically the detailed contemporaneous notes of the
conversation written by the OPR investigator and Plaintiff's own submission to the investigator.  (Doc.
117-6; Doc. 123-10.)  Unsupported, conclusory affidavits are "insufficient to defeat a properly supported
motion for summary judgment."  *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999).
    But, even accepting Plaintiff's most recent contentions as true, she agreed that her conversation
with the investigator made her aware of eight of the specific complaints made to OPR.  (Doc. 123-9 at 1;
Doc. 123-75.)  She was already aware of many of the other allegations against her from her employment
grievance process.  This knowledge gave her actual notice of the "basis of the cause of action" for
defamation, *Agency of Natural Resources v. Towns*, 168 Vt. 449, 452 (1998), inquiry notice of the other
allegations against her, and, under *Dulude*, triggered the accrual of her claim.

ascertain that her legal rights have been violated). In other words, once Plaintiff had actual (or inquiry) notice of facts sufficient to give rise to a cause of action against Defendants for defamation, the claim accrued and the statute of limitations began to run. In this way, "[t]he discovery rule simply provides a starting point for the [three]-year limitations period; the plaintiff's case need not be airtight before the limitations period commences." *Fritzeen v. Gravel*, 2003 VT 54, ¶ 10, 175 Vt. 537, 830 A.2d 49 (quotation omitted). Plaintiff need not have been aware of the full extent of the publication, and thus the full scope of her damages, to have had an actionable claim for defamation when she was aware of the initial publication to OPR. This is because "[f]leshing out the facts will occur during investigation of the matter or during discovery after the lawsuit is filed." *Rodrigue v. VALCO Enterprises, Inc.*, 169 Vt. 539, 541 (1999). As Plaintiff was on inquiry notice by November 2002, her suit is untimely.

This conclusion is entirely consistent with prior Vermont cases. For example, in *Dulude*, a nurse sued her hospital-employer, alleging that in 1992, her supervisor defamed her in a false report that she had diverted narcotics and falsified records. *Dulude*, 174 Vt. at 85. The hospital then allegedly republished the defamatory statements in 1994 to a patient and another nurse. *Id*. The nurse filed her defamation claim approximately four years later, in April 1998. *Id*. Dulude admitted that she was aware of the 1992 defamation, but could not have been aware of the 1994 re-publication until within the statute of limitations, making her claim timely. *Id*. at 85-86. The Vermont Supreme Court disagreed. The hospital, by the court's estimation, had taken "no steps to hide any report or patient complaint," and had specifically referenced the patient in

question in its February 1995 termination letter to the plaintiff.  *Id*. at 86.  In addition, Dulude had interviewed the patient in January 1995, giving her the "opportunity at that time to discover facts that would lead to the discovery of the present claim."  *Id*.

The same holds true here.  Plaintiff does not challenge the initial publication of the defamatory statements (i.e., the statements between employees at CVMC), which she admittedly became aware of outside the limitations period.  These communications do not form the basis of her cause of action.  Instead, she challenges the subsequent re-publication of these communications to OPR.  As in *Dulude*, Defendants took no steps to hide such re-publication to OPR.  Moreover, here, in stark contrast to *Dulude*, Defendants specifically informed Plaintiff that they had filed a complaint with the Board of Nursing.[11]  Similarly, just as the nurse in *Dulude* had the opportunity to speak with the recipient of the re-publication (the patient), Plaintiff in this action spoke with the OPR investigator who was in possession of the allegations in November of 2002.[12]  Indeed, Plaintiff discussed nearly every allegation with the investigator, and had the "opportunity," *Dulude*, 174 Vt. at 86, which is all that is required by *Dulude*, to discover the full content of the statements made by Defendants to OPR.  Particularly given her

---

[11]  Given this notice, the facts of this case are even more compelling than those in *Dulude*, as the plaintiff in that case was never specifically made aware by the defendant that the defamatory statements had been republished.  In other words, Plaintiff here had *actual* notice, whereas the plaintiff in *Dulude* had mere *inquiry* notice.  The end result, of course, is the same: the claim accrues and the statute of limitations begins to run.

[12]  In light of the result reached, I need not address the fact that Plaintiff has not alleged any publication of allegedly false information to OPR by Defendants Theken or Mason.  The only Defendants identified in the investigative notes as having provided information to OPR are Palmer and Spring.  (Doc. 117-6 at 3-14.)

detailed knowledge of the allegations in the previous internal complaint, Plaintiff was clearly on inquiry notice by November 2002. *See Lapinsky v. Copley Hosp.*, No. 1:05-cv-34, 2007 WL 3143331, at *4-5 (D. Vt. Oct. 25, 2007).

In short, it is undisputed that by November 2002 Plaintiff had been confronted by her employer about her work performance, challenged the veracity of the allegations, described the allegations as defamatory, was told that a report to OPR had been made, and had been questioned about nearly every allegation by an OPR investigator. This sequence of events was more than sufficient to put Plaintiff on inquiry notice, if not actual notice, of the basis of her cause of action for defamation.

Plaintiff's attempt to apply the doctrine of equitable tolling fails. Vermont law allows equitable tolling "only when the defendant actively misled the plaintiff or prevented the plaintiff in some extraordinary way from filing a timely lawsuit, or the plaintiff timely raised the precise claim in the wrong forum." *Town of Victory v. State*, 174 Vt. 539, 541 (2002). Plaintiff bears the burden of showing that she is entitled to equitable tolling. *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). The first condition is unsatisfied here, because, as stated, Plaintiff was on inquiry notice of the defamatory publication to OPR, and thus it cannot be said that Defendants prevented Plaintiff "from discovering the facts essential to the filing of a timely lawsuit." *Kaplan v. Morgan Stanley & Co., Inc.*, 2009 VT 78, ¶ 11, 186 Vt. 605, 987 A.2d 258. The second condition—that Plaintiff "timely raised the precise issue in the wrong forum," *id.*—is also unavailing. Although Plaintiff may have argued in the state administrative proceeding that the statements by Spring and Palmer to the OPR investigator were false, she did not

actually assert a legal claim for defamation (or any of the other five claims in this case) at that time. Indeed, Plaintiff raised no formal claims whatsoever in that proceeding, and instead, by way of disputing the allegations, simply alleged the falsity of the charges. Such general factual assertions, unaccompanied by any kind of formal complaint or cause of action, are insufficient to toll the statute of limitations. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) (equitable tolling applies "where the claimant has actively pursued his *judicial* remedies by filing a *defective pleading* during the statutory period") (emphasis added); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975) (equitable tolling unavailable where plaintiff has "separate, distinct, and independent" remedies and has slept on his rights with regard to one of them).

In her response to Defendants' Motion for Summary Judgment, Plaintiff makes two primary arguments. First, she contends that defamation should be treated as a "continuing tort," and therefore the continuing injury essentially re-accrues the cause of action, rendering her claim timely.[13] This argument fails, as it is directly contrary to Vermont law. As discussed above, the Vermont Supreme Court has held that, "the accrual of a cause of action in defamation may be deferred until the plaintiff discovers or, through the exercise of reasonable care and diligence, should have discovered the nature

---

[13] In the case cited by Plaintiff for this argument, *Page v. United States*, 729 F.2d 818 (D.C. Cir. 1984), a veteran sued the United States under the Tort Claims Act, alleging that the Veterans Administration had subjected him to harmful drugs during a nineteen-year course of treatment. The court allowed the plaintiff to proceed with his lawsuit, reasoning that the relevant conduct was "gradual, resulting from the cumulative impact of years of allegedly tortious drug treatment," and thus constituted "precisely the sort of continuous conduct . . . that justifies characterization as a continuing tort." *Id.* at 822-23. Here, in contrast, there is no such continuous conduct.

of the defamatory communication." *Dulude*, 174 Vt. at 85. Any later injury, though it may be regarded as "continuing," does not render a stale claim timely.

Finally, Plaintiff maintains that OPR's re-publication of the allegedly defamatory statements should be attributed to Defendants because it was foreseeable, at the time Defendants made the statements, that OPR would republish them. Plaintiff claims that, because OPR's re-publication was within the statutory limitations period, her claims are timely. Plaintiff cites to no Vermont case law supporting this argument, and for good reason—none exists.

While this issue is readily resolved by the generally-applicable standard governing the accrual of defamation claims, a series of century-old Vermont Supreme Court cases specifically govern the scope of liability of a publisher for subsequent republications of defamatory statements. In *Nott v. Stoddard*, 38 Vt. 25, 30 (1865), a woman brought an action for slander relating to statements charging her with stealing wood. The court held that it was proper to admit evidence to the effect that, after the slander, there was a rumor elsewhere that defendant had so accused the plaintiff on the basis that "[t]he defendant is responsible for the necessary consequences of his wrongful act." But in subsequent cases interpreting *Nott*, the court made clear that such evidence was admissible as "only a ground of additional damages consequent upon the greater extent of injury occasioned thereby," and "never as an additional ground of recovery." *Crane v. Darling*, 71 Vt. 295, 44 A. 359, 361 (Vt. 1899); *see Kidder v. Bacon*, 74 Vt. 263, 52 A. 322, 324 (Vt. 1902); *see also Earle v. State*, 170 Vt. 183, 190 (1999) (stating, in the context of a different cause of action, that "[n]ormally, a plaintiff cannot claim that an additional limitations

period is inaugurated when additional injuries arising from the same incident are discovered later. A cause of action is generally deemed to accrue at the *earliest* point at which a plaintiff discovers an injury and its possible cause.").

This is with good reason. Any defamation on the part of Defendants has to do with their conduct in communicating the allegedly false information to OPR. This conduct had long since taken place, and Plaintiff was on actual notice thereof, before OPR's publication of the charges. This later decision to publish, and therefore pursue, formal charges rested solely with OPR. *See* 3 V.S.A. § 129(a). Neither CVMC nor the individual Defendants directed that a specification of charges be filed. If this republication could revive a claim for defamation against Defendants, it would leave the original publisher at the mercy of the publishee for the purposes of the application of the statute of limitations, which would frustrate the very purpose of statutes of limitations— fairness to a defendant—by reviving long-stale claims by no act of the defendant. As a matter of Vermont law, subsequent republication is relevant only to damages, and does not trigger the accrual of a new cause of action for defamation against the original publisher. Therefore, the only actionable defamation occurred between certain Defendants and OPR, which Plaintiff was made aware of, and thus the statute of limitations began to run, in November 2002.

It bears reiterating that application of the discovery rule works little injustice in this case. In an exhibit appended to her response to the Motion for Summary Judgment, Plaintiff provided an April 3, 2002 letter from the Vermont Secretary of State's Office. (Doc. 123-12.) Therein, Plaintiff was informed that the Board of Nursing had opened an

investigation of her conduct after receiving a complaint from Spring. According to Plaintiff's affidavit, this letter merely confirmed what she already knew, as Spring had notified her about the filing of charges at a meeting at CVMC on March 20, 2002. (Doc. 123-27 at 9-10.) By this time, Plaintiff was well aware of the allegations Spring had brought against her in the internal complaint at CVMC. The letter from the Secretary of State's Office goes on to state that the case would either be closed without disciplinary action, or that disciplinary action would be pursued. Disciplinary action, by the letter's description, would be a "public" process. (Doc. 123-12.) In other words, Plaintiff was aware as early as April 2002 both that the matter had been referred to the Board of Nursing and that the disciplinary proceedings could be made public (i.e., that the original publication to OPR could be republished). Furthermore, not only was Plaintiff fully aware of the facts that would form the basis of her cause of action at this time, but she was also familiar with the applicable law, as evidenced by her submission to the April 2002 CVMC grievance panel, which is replete with references to the law of defamation. (Doc. 117-9.)[14] Even by her own admission, Plaintiff was fully aware of the OPR republication and its contents in December 2003, giving her nearly two years to file suit before her claims lapsed in November 2005. She failed to do so.

Plaintiff's defamation claim is time-barred under 12 V.S.A. § 512(3).

---

[14] Plaintiff was even contemplating filing suit against CVMC as early as January 2002, as she stated during the hearing on the instant Motion that she consulted with an attorney at that time.

**B.     Whistleblower Protection Statute**

Plaintiff also brings a claim against CVMC and the individual defendants under 21 V.S.A. § 507, which provides protection for "whistleblowers" who are employees of hospitals and other health-care facilities.  The statute bars employers from taking "retaliatory action against any employee because the employee" discloses the employer's illegal activity, provides information to a public body investigating allegations of the employer's illegal activity, or refuses to participate herself in activity that the employee reasonably believes violates the law.  *See* 21 V.S.A. § 507; *Griffis v. Cedar Hill Health Care Corp.*, 2008 VT 125, 185 Vt. 74, 967 A.2d 1141.

Plaintiff's claim under the whistleblower statute is not cognizable.  As a preliminary matter, the statute, by its terms, applies only to hospitals (such as CVMC) and not individuals (such as Palmer, Spring, Theken, and Mason).  *See* 21 V.S.A. § 507(a)(3).  As a result, to the extent Plaintiff brings this claim against the individual defendants, it cannot be maintained.  In addition, Plaintiff's claim under the whistleblower protection statute is similarly barred by the statute of limitations.  The "retaliation" that Plaintiff alleges in her whistleblower protection claim is the very same conduct that forms the basis of her defamation claim—false reporting to OPR to initiate state disciplinary proceedings against her.  In her Amended Complaint, Plaintiff alleges that Defendants "took actions towards punishing Plaintiff with defamatory allegations, for exercising a protected right." (Doc. 102 at 13.)  Because Plaintiff's claim is based on the same conduct as her defamation claim, for the reasons stated above, she had inquiry

notice of the facts forming the basis of her whistleblower protection claim.  Therefore, this claim is also time-barred.

### C.    Constitutional Claims

In Counts III through V, Plaintiff raises constitutional claims, alleging "[r]etaliation in violation of [the] First Amendment," "[c]onspiracy to deny equal protection of the law" in violation of 42 U.S.C. § 1985, and "[d]eprivation of [c]ivil [r]ights under [c]olor of the [l]aw" in violation of 42 U.S.C. § 1983.  (Doc. 102 at 13-15.)

Plaintiff's constitutional claims fail for a number of reasons.  First, Plaintiff has not alleged the elements required for maintenance of her conspiracy claim under 42 U.S.C. § 1985.  "A § 1985(3) 'conspiracy must . . . be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir.2007) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)); *see also Herrmann v. Moore*, 576 F.2d 453, 456-57 (2d Cir. 1978) (affirming summary judgment on § 1985(3) claim because plaintiff did not show discriminatory animus).  In the hearing on the instant Motion, Plaintiff specifically disclaimed any allegation of class-based discrimination, thereby effectively surrendering this claim.  Second, Plaintiff has failed to allege state action—a necessary prerequisite for each constitutional claim—for the conduct forming the basis of her causes of action.  *See Kaczanowski v. Med. Ctr. Hosp. of Vermont*, 612 F. Supp. 688, 697 (D. Vt. 1985).  Plaintiff's repeated assertions, without evidentiary support, that a conspiracy existed between individuals at CVMC and state officials associated with the OPR investigation is insufficient to establish state action.  *See White*

*v. Monarch Pharmaceuticals, Inc.*, 346 F. App'x 739, 741 (2d Cir. 2009) (when "allegations of a nexus between the private defendants and the State are vague and conclusory, [the allegations] fail to demonstrate that the actions of the defendants should be treated as state action"). But finally, and fundamentally, Plaintiff is again complaining about the very same conduct that forms the basis of her defamation claim, which makes these constitutional claims untimely under the applicable statute of limitations.[15]

### D.    Intentional Infliction of Emotional Distress

Lastly, Plaintiff raises a claim for the intentional infliction of emotional distress. To succeed on this claim, Plaintiff must establish that Defendants engaged in "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Sheltra v. Smith*, 136 Vt. 472, 476 (1978) (citing *Spackman v. Good*, 245 Cal. App. 2d 518, 530 (1966)). "It is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue meets this test." *Dulude*, 174 Vt. at 83.

The conduct alleged here does not rise to this level. The Vermont Supreme Court has held that, "the mere termination of employment will not support a claim for intentional infliction of emotional distress. However, if the manner of termination evinces circumstances of oppressive conduct and abuse of a position of authority vis-a-

---

[15] The analysis of equitable tolling under Vermont state law also applies to Plaintiff's federal claims. *See Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 2007) ("Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled, unless state tolling rules would defeat the goals of section 1983." (internal citation omitted)).

vis plaintiff, it may provide grounds for the tort action."  *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296 (1990).  Here, Plaintiff was not even terminated, but rather voluntarily resigned.  The good faith reports to OPR, *see infra*, similarly cannot be deemed "outrageous" conduct sufficient to support a claim for the intentional infliction of emotional distress.  This threshold requirement is far from met.

Moreover, the claimed "outrageous conduct" forming the basis of Plaintiff's intentional infliction of emotional distress cause of action is Defendants' "publication" of certain allegedly false statements to OPR.  (Doc. 102 at 17.)  As discussed above, Plaintiff was on notice of this publication in November 2002; thus, for the same reasons as stated above, this claim is untimely.

In sum, in addition to various deficiencies specific to each of Plaintiff's causes of action, all of Plaintiff's claims are barred by the applicable three-year statute of limitations because she was on notice, for purposes of the accrual of her causes of action, of Defendants' allegedly defamatory publication to OPR in November 2002, but did not file suit until December 2006.  On this basis, Defendants' Motion for Summary Judgment should be GRANTED.

## III.    Statutory Immunity

Defendants also argue that they are entitled to protection from civil liability under the statutory immunity for good faith reporting to the Nursing Board found at 26 V.S.A. § 1582(d).  (Doc. 117 at 17-25.)  Plaintiff counters that, because Defendants acted "in bad faith, with malice and with reckless disregard for truth," they are not entitled to the protection of this statutory immunity.  (Doc. 123 at 18.)

Under Vermont law, statements made by employers and colleagues reporting allegations of misconduct to the state nursing board may be protected by statutory immunity.  Because state law requires "[a]ny hospital, clinic, community health center or other health care institution" to report to the board "any disciplinary action taken by it or its staff" that specifically involves "misconduct or allegations of misconduct," 3 V.S.A. § 128(a), it provides a concomitant immunity to ensure that "[a] person shall not be liable in a civil action for damages resulting from the good faith reporting of information to the board about incompetent, unprofessional, or unlawful conduct of a nurse," 26 V.S.A. § 1582(d); *see also* 3 V.S.A. § 128(d).  In other words, to facilitate compliance with the mandatory reporting requirement, state law protects good faith reporting to the nursing board.[16]  Defendants concede that they bear the burden to establish they are entitled to the protection of this statutory immunity.

As the Vermont Supreme Court has never discussed the meaning of good faith in the context of this particular statutory immunity, this Court must "look to any sources on which the state's highest court might rely in order to determine what that court may decide." *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 71 (2d Cir.

---

[16]  There is no merit to Defendants' contention that they are entitled to the benefit of the absolute immunity applicable to the state Defendants involved in the OPR proceeding.  (Doc. 125 at 5.)  For this proposition, Defendants cite a case out of Virginia, *Watt v. McKelvie*, 248 S.E.2d 826, 829 (Va. 1978).  In that case, the court held that third-party statements made during judicial proceedings are absolutely privileged and could not be used as a basis for any civil liability of the originator of the statements.  The court adopted that rule on the basis of the policy that "the public interest is best served when individuals who participate in law suits are allowed to conduct the proceeding with freedom to speak fully on the issues relating to the controversy." *Id*.  Of course, this same policy is served here by the statutory immunity applicable to good faith reporting to the nursing board—it ensures that individuals will speak freely and openly with the nursing board without fear of civil liability (unless the reports are made in bad faith).  As a policy matter, there is no need for any additional overlapping immunity.  The absolute immunity applicable to the state defendants in no way cloaks the hospital defendants.

2000).  Analogizing a similar statutory immunity to qualified immunity, one court has found that "[a] plaintiff can satisfy this burden [to show bad faith] with a showing of malice." *Thompson v. Olsten Kimberly Qualitycare, Inc.*, 33 F. Supp. 2d 806, 816 (D. Minn. 1999).  "Malice is demonstrated by proving that the defendant made the statement at issue from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." *Id.* (quotation omitted).  The Vermont Supreme Court has discussed a similar standard with respect to qualified immunity applicable to claims of defamation: "knowledge of the statement's falsity or with reckless disregard of its truth, or conduct manifesting personal ill will, reckless or wanton disregard of plaintiff's rights, or carried out under circumstances evidencing insult or oppression." *Crump*, 154 Vt. at 293 (quotations omitted).  As the parties appear not to dispute the standard of bad faith applicable here, I proceed accordingly.

While conceding that the statute applies to the instant case, Plaintiff asserts that the reporting was made in bad faith, and therefore falls outside of the protection offered by the statute.  At the least, Plaintiff maintains that the question of Defendants' good faith is a genuine issue of material fact precluding summary judgment.

The bases for the reports included in the OPR specification of charges are well-established by the record.

### A. Fearing That She Would Develop Patient's Symptoms and Ignoring Patient Call Lights

In March 2001, Sharon Bisson was working as the evening shift nurse supervisor at CVMC, which made her responsible for the supervision of the nursing staff on the evening shift. (Doc. 117-22 at 2.) According to a letter drafted by Bisson on March 6, 2002, during a dinner conversation Plaintiff mentioned that "she had begun developing the exact same symptoms of the patients she had been caring for." (Doc. 117-23 at 2.) According to Bisson, this had translated into a difference in how Plaintiff treated patients, as she would medicate patients if they complained of any pain at all without asking about the details of their pain "for fear that she would develop the same symptoms." (*Id.*) During her deposition for this case, Bisson stated that she had never encountered a similar situation. (Doc. 117-22 at 4.) Similarly, Bisson reported to Palmer that she had "observed [Plaintiff] sitting while numerous patient call lights are on." (Doc. 117-23 at 6; Doc. 117-20 at 2.) Bisson relayed both concerns to Defendant Palmer. (Doc. 117-23 at 1.) Palmer subsequently discussed the allegations with Plaintiff. (Doc. 117-20 at 2.)

### B. Hanging IV Bag Incorrectly

In May 1999, nurse Kim Bigelow reported an incident to Palmer in which she had asked Plaintiff to hang an IV bag for her patient. According to Bigelow, another nurse, Andrea Triguba, informed her that Plaintiff had hung the IV bag incorrectly, which had resulted in air in the tubing. (Doc. 117-21 at 1.) When Bigelow asked Plaintiff about

this, she denied having hung the bag.  (*Id*.)  Bigelow informed Palmer about this incident via email.  (*Id*.)

### C.    Telling Patient C.A. That Chest Pain May Be Result of Sexual Abuse

According to a memorandum dated November 29, 2000 drafted by registered nurse Helen Pickel, Plaintiff suggested to a patient, C.A., that her current chain pain could be due to sexual abuse inflicted by her brother earlier in her life.  (Doc. 117-21 at 12-14.)  Plaintiff told the patient that she needed to address her psychological issues because if she had any more medication for her pain, she would likely die.  (*Id*. at 4.)  Palmer was informed about this incident and discussed it with Plaintiff.  (Doc. 117-20 at 3-5; Doc. 117-21 at 4-5.)  Palmer also spoke directly with the patient.  (Doc. 123-6 at 5-6.)

### D.    Improperly Administering Medications to Patients

According to an e-mail from Julie Lassner, on or about October 7, 2001, Plaintiff declined to give patient P.S. necessary pain medication after the patient was in "terrible pain."  (Doc. 117-21 at 16; Doc. 123-6 at 22.)[17]  In her own affidavit, Plaintiff discusses another allegation from December 2000 in which Palmer asked her about an incident in which a patient stated that he never received his dose of Demerol from Plaintiff and that the pill was later found on the floor.  (Doc. 123-14 at 33.)  By Plaintiff's own description, the basis of this allegation appears to be a statement from the patient himself directly to Palmer.  (*Id*.)  In a contemporaneous e-mail, another nurse e-mailed Palmer about these

---

[17]  Plaintiff acknowledged this incident in an e-mail to Palmer three days later.  According to Plaintiff, she told the patient she would give pain medication at a later point in the evening but "just forgot."  (Doc. 117-21 at 10; Doc. 123-6 at 23.)

allegations after receiving a complaint from the patient.  (Doc. 123-6 at 10; Doc. 123-7 at 2.)

### E.      Telling Patient About Sight of Angels When Dying

On or about February 26, 2001 patient E.D. told Plaintiff that she had seen angels. According to the allegations in the statement of charges, Plaintiff responded that dying patients often see angels.  (Doc. 117-7 at 2.)  This complaint, according to an e-mail from Palmer to Plaintiff, came directly from the patient's daughter, who alleged that Plaintiff "had a conversation with [patient] discussing her poor prognosis and inevitable death." (Doc. 123-6 at 12; Doc. 117-21 at 11.)  "This conversation was reportedly very upsetting to the patient and subsequently, her family [was] outraged."  (Doc. 123-6 at 12.)

### F.      Failing to Properly Clean Patients and Rooms

On or about April 21, 2001, Plaintiff, in various ways, failed to pay adequate attention to the needs of three patients.  For one patient, Plaintiff left his room unlocked and the patient himself covered in feces.  Another patient's room was completely "trashed" with bed sheets that had feces on them, seizure pads still on the bed, and a drawer pulled out of a desk with all of its contents on the floor.  (Doc. 117-21 at 15.) Finally, Plaintiff left a patient with EKG leads on and a dirty johnny.  The entirety of these allegations are contained in a memorandum written by registered nurse Linda Lambert, (Doc. 117-21 at 15) about which she was deposed (Doc. 123-81).[18]

---

[18]  In her response to the Motion for Summary Judgment, Plaintiff states that she has not disputed the good faith of either Lambert or Amy Poole (another nurse) because neither was named as a defendant in her Complaint.  (Doc. 123 at 19.)

### G. Failing to Assist Patient M.H.

In June 2001, the son of a patient (M.H.) complained to a nurse at CVMC regarding Plaintiff's treatment of his mother. According to this individual, Plaintiff had failed to assist M.H. during six bouts of diarrhea because she was on a personal telephone call. He stated that he had to help his mother himself because of Plaintiff's failure to do so. (Doc. 117-21 at 8; Doc. 123-6 at 18.) Plaintiff denied any wrongdoing in her own personal summary of the incident. (Doc. 123-6 at 20-21.)

### H. Failing to Care for Patient C.H.

In December 2001, according to allegations from registered nurse Amy Poole, Plaintiff failed to render proper care for a terminal patient, C.H. Poole, per a contemporaneous memorandum, stated that she entered the patient's room and found her breathing heavily, gurgling audibly, and thrashing in her bed with her right leg hanging over the bed railing. After Poole cared for the patient, she informed Plaintiff about this incident, who responded that it was fine because "she's just comfort care." (Doc. 117-23 at 8; Doc. 117-14 at 2-4; Doc. 117-15 at 1-3.) Poole specifically noted the "severe distress that the patient was observed to be in" as well as Plaintiff's "seeming lack of compassion or understanding of how to alleviate this distress." (Doc. 117-23 at 7.) Poole reported this incident to Sharon Bisson, who then contacted Palmer and Spring. (*Id*. at 3, 5.) This incident was the subject of Plaintiff's grievance at CVMC. (Doc. 123-50.)

### I. Providing Toast to Patient on Strict Liquid Diet

The specification of charges also alleges that Plaintiff provided toast to a patient who was on a liquid diet. (Doc. 117-7 at 3; Doc. 117-16 at 10.) This charge originated

from Cathy Chartier, who, during her deposition, described the details of this allegation. (Doc. 123-84; Doc. 123-14 at 122.)[19]

### J.      Leaving Side Rail of Patient's Bed in Down Position

This allegation also originated with Cathy Chartier.  (Doc. 123-84 at 3-4; Doc. 123-14 at 122; Doc. 117-16 at 10.)

### K.      Passing Out Medication to Patients Late

This allegation also originated with Cathy Chartier.  (Doc. 123-84 at 4; Doc. 117-16 at 8.)  Plaintiff acknowledges that this practice is "quite common," and should not be considered misconduct.  (Doc. 123-14 at 116.)

### L.      Administering Medication Without Checking With IV Therapist

This allegation, as listed in the specification of charges (Doc. 117-7 at 3), also originated with Cathy Chartier.  According to Chartier, Plaintiff had prepared an IV Dilaudid and entered the patient's room without checking with an IV therapist.  (Doc. 117-16 at 14.)

### M.      Using Outdated IV Bags

According to contemporaneous notes written by Chartier, Plaintiff gave two patients outdated backup IV bags.  (Doc. 117-16 at 15.)

### N.      Failing to Administer Morphine to Hypoxic Patient

This allegation also originated with Cathy Chartier.  As Chartier described in her conversation with the OPR investigator, Plaintiff failed to recognize the proper treatment

---

[19]  Chartier, who at the time was named Cathy Harrington, was the nurse responsible for supervising Plaintiff during the implementation of her improvement plan.  (Doc. 117-4.)

protocol for a hypoxic patient. (Doc. 117-6 at 16-17.) Even after the respiratory therapist responded, Plaintiff still "would not push the button for the morphine." (*Id*. at 16.) This allegation is also mentioned in Plaintiff's written notes to the OPR investigator. (Doc. 123-10 at 24-25.)

### O. Neglecting Patients Wearing Diapers

As reflected in Plaintiff's own written notes for the OPR investigator, this complaint originated with Andrea Triguba, a float nurse at CVMC. (Doc. 123-10 at 29.) By Plaintiff's own description, Triguba told her in January 2002 that Triguba had cleaned up one of Plaintiff's patients who was wearing a diaper that was "soaked" with urine. (*Id*.)

In summary, every allegation laid out in the specification of charges is supported by some evidence in the record.

Against this mountain of evidence, in her response to the Motion for Summary Judgment (Doc. 123 at 18-26), Plaintiff cites two sources in support her allegation of bad faith: her own statements and affidavits (Doc. 123-14; Doc. 123-15; Doc. 123-27; Doc. 117-11; Doc. 123-20; Doc. 123-4; Doc. 123-71)[20] and materials indicating that hospitals generally may have people of bad faith working within them (Doc. 123-68; Doc. 123-69; Doc. 123-70). The latter are irrelevant to the issue of good faith in this particular case,

---

[20]  Included among these affidavits are allegations that: Plaintiff's "cultural background made [her] stand out as different" in the workplace (Doc. 123-20 at 1); Plaintiff's interest in alternative medicine caused animosity from certain of her colleagues (*id*. at 2-3); Plaintiff's diagnosis of cancer soon after starting employment at CVMC led to "social shunning" that continued throughout her employment (*id*. at 4); Plaintiff was disliked because of her refusal to violate nursing practices (*id*. at 4-5); hostility toward Plaintiff arose due to her distinguished record of educational achievement (*id*. at 5-6); and Plaintiff was "targeted" for abuse by her colleagues because she was older than many of the other nurses (*id*. at 6-7). None of these allegations specifically refute the factual bases for the allegations reported to OPR.

while the former provide an insufficient evidentiary foundation for this Court to conclude, in light of the proper support for the summary judgment motion, that a genuine issue of material fact continues to exist. A party may not create a genuine issue of material fact "by a mere allegation in the pleadings . . . nor by surmise or conjecture." *United States v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir. 1982). As such, "[t]he litigant opposing summary judgment . . . may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) (quotation omitted); *see Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). Instead, she "must bring to the district court's attention some affirmative indication that h[er] version of relevant events is not fanciful." *Quinn*, 613 F.2d at 445. Plaintiff has brought no such materials to this Court's attention to show the bad faith of those reporting to the board.

In numerous respects, Plaintiff does not dispute the factual allegations, but instead notes that Defendants should have investigated the allegations against her rather than rely on the reports of others. But such a failure to investigate does not alter the good faith nature of the reporting because the "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974). Mainly, Plaintiff disputes whether the conduct alleged should qualify as misconduct. This contention in no way undermines the good faith factual basis for any report to OPR. It is for OPR, not officials at CVMC (or this Court), to determine in its expertise whether the allegations of misconduct require discipline. CVMC is charged to disclose "allegations of misconduct," 3 V.S.A. § 128(a)(4); what OPR does with those

allegations is outside of CVMC's control.  Plaintiff's conclusory allegations of bad faith, thoroughly contradicted by a considerable amount of record evidence, cannot defeat summary judgment.  *See Wilson Jones Co. v. Gilbert & Bennett Mfg. Co.*, 332 F.2d 216, 219 (2d Cir. 1964) ("Mere conclusory affidavits that an issue exists no longer suffice to defeat well[-]grounded motions for summary judgment.").

As such, the Motion for Summary Judgment should be GRANTED on the basis of the statutory immunity present at 26 V.S.A. § 1582(d) and 3 V.S.A. § 128(d).  Plaintiff has not sufficiently alleged bad faith as necessary to defeat Defendants' Motion.

## Conclusion

For the reasons set forth above, I recommend that Defendants' Motion for Summary Judgment (Doc. 117) be GRANTED because Plaintiff's claims are barred by the statute of limitations.  Defendants' Motion should also be GRANTED on the basis of statutory immunity, 26 V.S.A. § 1582(d), 3 V.S.A. § 128(d), because the report to the nursing board was not made in bad faith.

Dated at Burlington, in the District of Vermont, this 20th day of December, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).